[Crim. No. 2529. First Dist., Div. One. Aug. 3, 1948.]

THE PEOPLE, Respondent, v. DORETHA McKNIGHT, Appellant.

Hoey & Hoey and Stanley C. Smallwood for Appellant.

Fred N. Howser, Attorney General, and David K. Lener, Deputy Attorney General, for Respondent.

BRAY, J.—Defendant was charged with the murder of one Robert Harvey Pergerson, and was convicted of the crime of manslaughter, from which conviction, as well as from the order denying a new trial, she appeals, making two contentions: (1) that certain testimony as to alleged accusatory statements in her presence was inadmissible; (2) that the evidence for the prosecution "is so far outweighed by evidence for the defense that the verdict is against the evidence."

The prosecution relies for conviction upon the testimony concerning defendant's attitude in the face of the alleged accusatory statements, and upon her admissions and incriminating statements.

## The Alleged Accusatory Statements Were Admissible

For six or seven months prior to the killing, defendant had been living in Crockett with Pergerson as his common law wife, in a cabin, consisting of two small rooms, 9 or 10 feet square. Her sister Thelma and the latter's husband, Charles Anderson, lived in an adjoining cabin, which was about 4 feet away from the Pergerson cabin.

The first witness was Deputy Sheriff Josephs, whose testimony was substantially as follows: He, together with a doctor, arrived at the Pergerson cabin about 7:15 p. m., enter-

ing the kitchen. There he saw the body of the deceased lying on a pile of groceries, against the wall. (The doctor examined the body and found the victim to be dead, and at the trial testified that the cause of death was a wound $4\frac{1}{2}$ inches deep in the chest, which could have been caused by the knife hereafter mentioned.) Charles and Thelma Anderson, defendant, another deputy sheriff and a deputy constable, were in the cabin. Anderson was sitting in a chair facing the body of the deceased, and through the door into the adjoining bedroom, which was open, Josephs saw Thelma and defendant seated on the bed. Defendant was facing the kitchen and was about $4\frac{1}{2}$ feet from where Josephs was standing while talking to Anderson. Defendant came into the kitchen once or twice during this conversation. Josephs noticed a kitchen knife, which had blood stains on it, lying on the sink. He asked Anderson what had happened. Anderson said that the four of them, Pergerson and defendant, Thelma and he, had been to Valona that morning and had been doing a little drinking; that they had left Pergerson and defendant, and gone to Vallejo. A little before 7 p. m. the Andersons were returning to their cabin and heard a commotion in the Pergerson cabin. Anderson entered the Pergerson kitchen and saw deceased grab defendant, who was facing deceased with her two hands together extended towards him and outward about a foot from her chin. Pergerson then fell against the ice box. Anderson said, "Doretha [the defendant], you done hurt Bob." Anderson saw defendant put the knife on the sink, and he moved it back against the wall. Deceased's shirt was open, and Anderson stated that defendant had been washing the blood off deceased's body with a cloth. (Defendant later admitted doing this.) Josephs, with the knife in his hands, walked into the bedroom and talked to defendant, who was hysterical. She said, "If they say I killed him I guess I did." She then said that the four of them had been in Valona, and the two couples separated. Deceased had purchased a pint of whiskey. At the Southern Pacific depot they met two men. Pergerson went with them into the men's room to drink. Defendant became provoked and she and deceased argued on the way and after they arrived home. "We were arguing a Hell of a lot coming down the track." She explained that she was quite disturbed over the fact that Pergerson had divided the whiskey with the two men. She didn't remember any more than that as "we were doing quite a bit of drinking and we were arguing quite a bit."

When the witness Josephs was asked to testify to his conversation with Anderson in the presence of defendant, an objection that such conversation would be hearsay was made. The following then occurred: "MR. TAYLOR [for the prosecution]: If Your Honor please, we inten*t* to show the conversation was definitely within Mrs. McKnight's presence; certain explanation of the crime was made at that time and there was no denial. MR. J. HOEY [for the defense]: If Your Honor please, we object; the conversation of some other individuals certainly isn't binding on the defendant. Of course, there is a rule that if you don't deny it it is admitted, but it must be only for that purpose. MR. TAYLOR: That is the only purpose. MR. J. HOEY: Can we have the record show that if this conversation is admitted it is solely for the purpose of showing that there was no statement or no denial made by the defendant. MR. TAYLOR: That is correct; that the defendant was accused of the crime and did not deny it." The court then questioned the witness as to the proximity of the defendant and the situation in the cabin at the time of the conversation, and then told the witness to proceed. No further objection was made concerning this line of testimony. It is apparent that counsel waived his former objection and consented to the introduction of this evidence for the purpose mentioned. Moreover, the testimony was admissible for the limited purpose of showing a consciousness of guilt on the part of the defendant. The rule as to accusatory statements is as follows: "The admission of such evidence is an exception to the hearsay rule. Evidence of conduct is receivable if it tends to show a consciousness of guilt or intent—such as flight, concealment, preparation, or other acts or declarations inconsistent with the theory of innocence." (*People* v. *Yeager,* 194 Cal. 452, 486 [229 P. 40].) ". . . the test for admitting such a statement into evidence is not, as announced by the trial court, that the accused 'had an opportunity to deny it,' but 'whether the accusation has been made under circumstances calling for a reply. . .' (*People* v. *Simmons, supra,* p. 712 [28 Cal.2d 699 (172 P.2d 18)]) . . . Each case must, therefore, be determined upon the facts and circumstances therein presented (*People* v. *Simmons, supra,* p. 715)." (*People* v. *Spencer,* 78 Cal.App.2d 652, 655, 656 [178 P.2d 520].) "Statements made by others are no less hearsay when made in the presence of a defendant. . . . Evidence of accusatory statements, however, may be received for but one purpose, namely, as the basis for evidence of the conduct of the accused in the face of

such accusations." (*People* v. *White*, 44 Cal.App.2d 183, 186 [112 P.2d 60].)

Defendant contends that there is no reasonable interpretation of the evidence which would support an inference that her conduct in regard to the accusatory statements was the result of, or was evidence of, a consciousness of guilt, and that her actions and statements, when considered in connection with the statement of Josephs that she was hysterical, were her way of expressing her ignorance of what took place. It is doubtful if her actions could be susceptible of that interpretation. But assuming that such is a possible inference, it is not the only one, and a more reasonable inference that could be drawn by the jury is her consciousness of guilt. Moreover, in all her statements she details all incidents before and after the stabbing (although she tells contradictory stories concerning them). In her earlier statements it is only the immediate time and circumstances of the stabbing of which she claims to be ignorant. Her memory appears to be a convenient one.

Defendant was within a few feet of Anderson, who said he saw her with her hands extended towards Pergerson; that Pergerson then dropped to the floor; that she then placed the bloody knife on the sink. While Anderson did not see the knife in her hands, her position, the falling of Pergerson with a stab wound, and her having the knife, leave no doubt that he was accusing her of stabbing Pergerson. He said he told her, "Doretha, you done hurt Bob." At no time during the relating of this conversation did defendant deny the charges being made by Anderson, and then when confronted by the deputy sheriff with the knife she said, "If they say I killed him I guess I did." This was hardly the statement of an innocent person, particularly when considered with the fact that, far from not knowing what had occurred, as defendant now contends her actions indicated, she claimed at the trial to know in detail what had occurred.

In *People* v. *Simmons*, 28 Cal.2d 699, at page 715 [172 P.2d 18], the court quotes from *People* v. *Amaya*, 134 Cal. 531, 536 [66 P. 794], as follows: " 'It is no doubt true, that, to render evidence of this character admissible, *the occasion and the circumstances* must have been such as to afford the accused person an opportunity to act or speak, and the statement must have been one naturally calling for some action or reply. (*Greenleaf on Evidence*, par. 197.) But in this state it has been uniformly held that an accusation of crime does call for a reply, even from a person under arrest. (Citing cases.)' "

94

■ In the instant case, defendant was not under arrest or restraint, but was definitely being accused by Anderson of killing the deceased. This accusation certainly called for a reply. If defendant's answer was not an admission of guilt, it was what is characterized in *People* v. *Simmons* (*supra*, p. 712), as "an evasive or equivocal reply."

While it was for the court in the first instance to determine whether the defendant's "conduct or response was such as to give rise to an inference of acquiescence or guilty consciousness" (*People* v. *Simmons, supra*, p. 712), it was for the jury to decide whether the defendant, by reason of hysteria or otherwise, was aware the statements were made, whether under all the circumstances shown they called for a disclaimer, and whether the actions and statements of the defendant did show a consciousness of guilt. The jury, by its verdict, found against defendant on these issues. That defendant was aware of the accusations, in spite of her hysteria, is shown by her statement, "If they say I killed him I guess I did."

### The Verdict Is Not Against the Weight of Evidence

■ In addition to the statements of defendant as testified to by the witness Josephs, the actions and statements of the defendant thereafter are important. Approximately three hours later, in the sheriff's office at Martinez, defendant related in detail the circumstances of the drinking and the quarrel, substantially as theretofore given by her to Josephs. When asked if she had killed deceased, she replied, "I wouldn't say I did and I wouldn't say I didn't"; and when again asked she said she didn't know, and in reply to the question, "Would you say you didn't?" she said, "Well, I wouldn't say that."

Defendant lays stress upon the fact that the witness Josephs made the statement at one time in his testimony that the defendant was hysterical. The extent of that hysteria was not brought out. It is significant, however, that her statements made at the time were practically identical with those made later that night when there is no contention that she was hysterical.

Another circumstance which the jury was entitled to consider on the question of her guilt was her testimony at the trial, which was directly contradictory of her statements to Josephs and at the sheriff's office. For example, in the latter statement, after telling about arguing with deceased about the whiskey, she stated that she and deceased finished the whiskey and she went to bed. "When I woke up, whether we have

another argument or what, that is all I remember. . . . After I went to bed I don't remember any more that happened." When asked if there was anybody else around who could have done the killing she said, "I don't know." She said she didn't "know if someone was crying or what woke me up." She didn't know how she got in the kitchen. Practically the first time she remembered anything after going to bed was when she was washing the face of the deceased, after he had been stabbed. She was asked several times if there had been any misunderstanding between deceased and Anderson, and she said not as far as she knew, and then that if they had had trouble that night she didn't know it. She admitted that she used one of the butcher knives to cut weenies for sandwiches just before retiring. She stated, "We quarreled about the whiskey. I said, 'Bob, you could at least asked me to have a drink of whiskey.' . . . I was drunk and Bob was drunk." "I could have, drinking and drunk. I could have, but to actually say I did I won't say I did, because I don't know I did."

Contrast those statements with her testimony at the trial. She testified that after deceased came out of the men's room at the depot there was no argument about the whiskey. When they got home she saw that half the whiskey was gone and she then told deceased that he should have waited to open the bottle until they got home. That was all there was to the whiskey incident. Defendant went to bed and to sleep. She remembers Anderson coming in and wanting to borrow some money. "I don't remember any more outside of a little loud talking, and Charlie [Anderson] says 'Bob is dead' loud." She jumped out of bed, grabbed a towel and washed deceased's face. She looked up and said, "Thelma, who killed Bob?" "Thelma said she didn't know, whoever killed him they would find the fingerprints on the butcher knife. I looked at Charlie. He had the butcher knife wiping the handle off, and a little later he says to me, 'Tell the law that you and Bob was playing with the butcher knife.' " No suggestion of this incident was made at any time prior to her taking the stand, and it is directly in conflict with her previous statements. At some length she detailed the presence of visitors at the cabin before she went to bed and their consuming the whiskey, in direct contradiction to her previous statements in which she said she and deceased were alone and that the two of them finished the bottle. She then definitely denied that she and deceased had any argument that day. While she previously stated she was

drunk, she now denied it, saying that she remembered everything that happened. She then stated that she had told deceased not to drink all the whiskey as she wanted him to save some, "because I knew he was going to buy some more Sunday, and I was only trying to save money to buy him a suit for Christmas."

A reading of the testimony of defendant not only shows that it is completely contradictory of and inconsistent with her previous statements, but also that as a witness she was evasive and unsatisfactory. The jury was justified in believing that her story on the stand was a manufactured and untruthful one in its essential aspects. In effect, she accused Anderson of committing the crime, claiming that she saw him pick the knife up off the floor and wipe the fingerprints off. Yet she studiously avoided actually accusing him. The jury could reasonably infer from her actions and those of Anderson and his wife that the three of them decided to shift the blame for the killing towards Anderson, but to make sure that it was not sufficiently shifted as to cause him to be held responsible for the crime.

Anderson apparently was cooperative with the officers immediately after the killing, and according to the testimony of Deputy Sheriff Rhoades agreed to come to the office of the district attorney or of the sheriff whenever requested. By the time of the coroner's inquest, however, he had disappeared. When they located him in Texas and brought him to the trial, he refused to testify on the ground that he might incriminate himself. Both defendant and Thelma testified as to the good relationship between the deceased and his brother-in-law Anderson, and that they never quarreled. No motive whatever was shown which would have caused Anderson to kill the deceased.

Thelma Anderson, like her sister, the defendant, was a most unsatisfactory witness. She, too, was evasive and her testimony was completely inconsistent with her statements previously given the officers. At the trial, she claimed that while in her cabin she heard Anderson and deceased talking loudly and arguing in the Pergerson cabin. Then she heard a thump like somebody falling. She went into the Pergerson kitchen, saw defendant in bed and heard Anderson say, "Bob is dead." Anderson picked the knife up off the floor and placed it on the sink. She said that the fingerprints would tell who committed the crime. Thereupon Anderson wiped off the knife. In her statement to the district attorney given prior to the

trial, she stated that after returning from Vallejo she started to undress. Anderson went out. The next thing she heard was defendant crying; she didn't hear deceased or Anderson at all, nor did she hear any noise or anything except the defendant crying. Her explanation of why she didn't tell the district attorney the truth was, "I had to tell you something." As was the case with the defendant, the jury could readily infer that Thelma was not telling the truth on the stand.

Thelma testified that the fact that she had heard the noise of defendant and her husband quarreling came to her after she had told the district attorney that the only thing she heard that evening from the Pergerson cabin was the sound of defendant crying. She further said that the fact that she saw Anderson pick up the knife and wipe it off came to her "After I thought about things." At various times in her testimony, she altered her story as to the location of defendant when she first entered the Pergerson cabin. She stated that defendant was getting out of bed, that she was out of bed and on her way to the kitchen, and that she was leaning over the deceased washing his face. She denied making most of the answers read to her from her statement given to the district attorney. Defendant stipulated that if the reporter who transcribed the statement were present, she would testify that it was a true and correct copy of that taken at the time.

An examination of the testimony discloses that the jury could very well conclude that the testimony of defendant and Thelma about Thelma saying the fingerprints on the knife would reveal the killer, and Anderson then wiping off the knife, as well as other identical testimony given by them, was an afterthought and fabrication. "The right to draw proper inferences from the evidence is a function of the jury; and as long as its conclusions do not do violence to reason, an appellate court is not permitted to substitute its finding of the ultimate fact for that reached by the constitutional as well as the statutory arbiter thereof." (*People* v. *Latona,* 2 Cal.2d 714, 725 [43 P.2d 260]. See also *People* v. *Perkins,* 8 Cal.2d 502, 511 [66 P.2d 631].)

Under the testimony in this case, for the jury to find other than that defendant, after a lengthy quarrel with the deceased, had stabbed him, would have been a miscarriage of justice. The verdict, instead of being against the weight of evidence, is completely borne out by it. The claim of the defendant that the statement of Anderson to Josephs that he had moved the

knife on the sink, causes the conclusion that the story of defendant and Thelma that she mentioned fingerprints and he wiped them off, is inevitably true, is farfetched. Unfortunately, while the evidence shows that there were no "identifiable" prints on the knife, it does not show whether this was due to a wiping of the knife or a blurring of prints thereon.

Because on the stand the defendant and Thelma made an unqualified denial of defendant's guilt, defendant contends that the verdict is against the weight of the evidence. It was for the jury to determine what weight to give to these denials. Their testimony was impeached by prior statements, and by the evasiveness of the witnesses and the contradictions in their testimony.

The duty of this court is expressed in *People* v. *Pratt,* 77 Cal.App.2d 571 [175 P.2d 888], where the court at page 576 quotes from *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778], as follows: " '*We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict.*' "

The evidence here reasonably justifies the verdict. The judgment and order denying a new trial are affirmed.

Peters, P. J., and Ward, J., concurred.