[Crim. No. 5721. Second Dist., Div. One. Aug. 1, 1957.]

THE PEOPLE, Respondent, v. WILLIE CLEMMONS et al., Defendants; BENNETT COOK et al., Appellants.

Robert Miller Green, under appointment by the District Court of Appeal, for Appellants.

Edmund G. Brown, Attorney General, and Morris Schachter, Deputy Attorney General, for Respondent.

FOURT, J.—In an information filed in Los Angeles County, appellants Bennett Cook and Will Jones, with defendants Clemmons and James Jones, were charged with two counts of armed robbery in that on January 20, 1956, they unlawfully took by force from Robert L. Parsons money and merchandise of the value of $65, and from James T. Jeffery $25, and that each had prior felony convictions. Each defendant plead not guilty and admitted the prior convictions. The jury found each guilty as charged and fixed the degree in each instance as robbery in the first degree. Motions for a new trial and probation were made by the appellants and each such motion was denied, and each defendant was sentenced to the state prison. This appeal is by Bennett Cook and Will Jones from the judgments.

The facts as developed by the evidence are as follows: On Friday, January 20, 1956, Robert Parsons was working at a liquor store at the north side of Vernon Street, near the intersection of Vernon and Arlington Streets in Los Angeles. Shortly after 5 o'clock p.m., on that day, Kerby, a station attendant at a Shell service station located on the northeast corner of Vernon and Arlington, saw a car drive west on Vernon to Arlington and then turn right on Arlington and park around the corner, beyond an alley which bordered the back part of the service station. Kerby saw two men get out of the automobile, walk south on Arlington and then turn east on Vernon where they walked by Kerby, at which time they were very close to him, and he got a good look at each of them, and later positively identified the two men as the defendants Clemmons and James Jones. The two men went into the liquor store and asked Parsons to show them some liquor, and thereafter said to Parsons, "Hold it. Freeze. This is a stickup. Don't move and you won't get hurt"; Clemmons had a loaded gun in his hand pointed at Parsons. James Jones took an 1879 silver dollar, pocket knife, keys and some small change from Parsons' pockets, and then opened the cash register and took about $65 from the register in $10, $5.00 and $1.00 bills, and $20 or more in silver. It was because of Parsons' fear of getting shot or hurt that he permitted the men to take the property from his person and from the register. They also took a bottle of Cream of Kentucky and a bottle of Old Crow whiskey. During the robbery of Parsons, James T. Jeffery, a prospective customer, walked into the store. Clemmons ordered Jeffery to "Freeze. . . .

This is a hold up.'' The two defendants took $25 out of Jeffery's wallet and then gave the wallet back to him. It was because of the loaded gun being held on Jeffery that he was induced to give the men his wallet. Parsons and Jeffery were then put into a back room and told to stay there for five minutes. While the robbery was in progress Kerby walked by the liquor store and saw through the window what was taking place and then went into a bar next door and called the police. In the meantime, Parsons had remained in the back room of the liquor store until the defendants left the building and then came out and saw that they had turned east on Vernon. Kerby, as he came out of the bar, saw the two defendants going east on Vernon. The defendants then turned north up an alley parallel with Arlington, and then into the alley back of the service station and then into the waiting automobile. Kerby did not see who the person or persons were who remained in the automobile during the holdup and did not see who was driving the car and could not and did not identify Cook as being in the automobile or as a participant in the holdup.

The defendants were jailed about 1:30 o'clock a.m., or so, on Saturday, January 21, 1956. A complaint was filed after a writ of habeas corpus was filed in behalf of the defendant Cook, some nine days later. The officers were fully aware of the fact that they were required by law to take a defendant before a magistrate within 48 hours after the arrest (Pen. Code, § 825). One officer gave as a reason for the dereliction in this respect that each time they interviewed the defendants something new developed and therefore the extended time from the arrest to the date of the filing of a complaint. Clemmons and James Jones were positively identified by Parsons, Kerby and Jeffery at a ''line-up'' on Monday night, January 23d, at the police station, as being the two men who held up Parsons and Jeffery in the liquor store.

Officer Walker of the Los Angeles Police Department testified that at about 1:30 o'clock a.m., January 21, 1956, he participated in the arrest of the four defendants, which took place at an apartment on Avalon Boulevard, where James Jones, Will Jones and Cook were in the living room drinking and listening to the radio, and Clemmons was in the bedroom. Another person, Russell Hicks, was in the apartment at the time. Walker found a loaded gun in the pocket of a topcoat on the bed opposite where Clemmons was lying down. The gun was identified by Parsons as looking like the gun

Clemmons held on him during the holdup. Walker also found a partly emptied bottle of Old Crow whiskey in the living room, and a partly emptied bottle of Cream of Kentucky whiskey in the kitchen. He also found some rolls of coins in the dresser drawer in the bedroom. On the person of Cook he found $16.55, consisting of six $1.00 bills, and $10.55 in miscellaneous change. The other defendants had varying small amounts of money. The car, which was identified by Kerby as being at the scene of the robbery, was parked near the apartment and was pointed out by Will Jones as being his automobile.

### The Jones Appeal

The defendants were each frequently interviewed by the officers, and statements of one sort or another were made by each of the defendants. Will Jones made a statement on January 23, 1956, at about 4 o'clock p.m., which he later signed. He now contends that any statement he made was not free and voluntary. Officer Woolley testified, however, that the statement was given freely and voluntarily, and not in exchange for any promises. The trial court obviously believed the officer's testimony in this respect. In the written statement Will Jones told of driving his car with the three other defendants to another part of town to see about robbing a service station; that on their return to the scene of the robbery in question, Cook drove the car and parked it on Arlington, near the alley, and Clemmons and James Jones went into the liquor store. He stated that he did not know that the robbery was to take place and refused to take any of the money when it was later divided. On January 30, 1956, at a "round table" conference, which will be alluded to later, Will Jones admitted his participation in the robbery. He did not remain silent but answered affirmatively to accusatory statements which clearly point to his guilt. The accusatory statements and his replies were properly admitted into evidence. (*People* v. *Simmons,* 28 Cal.2d 699, 712 [172 P.2d 18]; *People* v. *Spencer,* 78 Cal.App.2d 652, 655 [178 P.2d 520].) The sole fact that the defendant Will Jones was under arrest at the time does not render the statements made inadmissible. (*People* v. *Bashor,* 48 Cal.2d 763, 765 [312 P.2d 255].) There was no evidence that the statements of Will Jones were anything but free and voluntary. Officer Woolley, who was at the "round table" talk, stated that he had used no force upon any of the defendants, and had made no promises or threats to any of them. Will Jones

did not testify, nor did he offer to testify on the question whether his statements were free and voluntary. His only objection at the time of trial was that it was a statement which flowed from an illegal detention. The court considered the rule as set forth in *Rogers* v. *Superior Court*, 46 Cal.2d 3, 10 [291 P.2d 921], and correctly determined that under that case the "illegal detention" was a factor to be considered in determining whether the admission was voluntary, but that an objection made solely upon the fact that the admission was made during a period after being detained 48 hours was not well taken. As indicated, there is independent evidence that his automobile was used in the robbery.

It is clear that the judgment as to Will Jones should be affirmed.

### THE COOK APPEAL

In the matter of the appeal of Bennett Cook we find an entirely different situation. Officer Walker started to testify as to the conversation he had had with Cook on January 23, 1956, at about 2 o'clock p.m. By way of foundation, the officer stated that the statements which had been made to him were made freely and voluntarily, that no promises of any kind were made to Cook, that no force was used upon Cook at that or any other time, and that no threats were made to Cook at that or any other time. The officer was then taken on *voir dire* examination by counsel for Cook and Will James, and the officer stated that Officer Reed was with him at the time of the statement of Cook on the 23rd of January, and that neither he nor Reed struck Cook, nor did they shove him or threaten him, and that there was no profanity used toward Cook in a threatening manner. Permission was then secured by counsel for Cook to have Officer Walker withdrawn from the witness stand, and have Cook sworn as a witness to testify for the sole purpose of showing that any such statement made by him on January 23, 1956, was not free and voluntary and that no statement made by Cook thereafter was free and voluntary. Cook was sworn and testified in substance that he was called from his cell on the 23rd of January by Officers Walker and Reed, and that they then took him to a room where he was questioned. Cook testified that the officers said to him, "Well, you know, we have you dead bang. You may as well come on in," and other statements of a similar nature. Cook further testified that he then denied having anything to do with the robbery. Hicks was then brought into the room by another officer, and con-

fronted Cook. Hicks was asked by one of the officers, "Is this the man that gave you the money?" and Hicks replied "Yes." Cook said, "Well, I didn't give him any money." Hicks was then taken away. Officer Walker, according to Cook, then reached across the table and struck Cook very hard on the head, and then the officer stood up and said, "Didn't you do it?" and Cook answered "No, I didn't," whereupon Officer Walker struck Cook in the side, which resulted in Cook being huddled up against the wall. Officer Walker then again asked, "You did give Russell the money, didn't you?" Cook then related, ". . . I saw that it wasn't going to get him off of me, and I told him, 'Well, yes, I gave it to him,' because I was not under oath anyway. . . . I just wanted to make him leave me alone." Cook further testified that while on the way out of the room in question, and while in a corridor, Officer Reed hit him in the stomach and said, "When we come back, I am going to beat you all over this place unless you say what we want you to say," and that the officer then said, "When I get tired of beating you, my partner will be ready to beat you some more because you are going to do what we want you to do. Do you understand that?" and Cook answered, "Yes, sir." Further, Cook testified that the officers said to him, " 'We'll bring you out for showups, and we'll keep you in here indefinitely, 18 months if necessary,' and said, 'It has been done,' and he says something to the effect that, 'I have 10 or 15 more years on this force, and as long as you are in Los Angeles I am going to keep getting you until I—I am going to keep picking you up until I stick you with something.' "

Cook also testified in substance that he thereafter told the officers whatever he thought they wanted him to say, without regard to whether it was the truth or not, to the end that they would not beat him any further.

Cook stated that he was again questioned in a day or so following the January 23rd episode, and was put in a "line-up" where he was observed by an audience and was asked to step back into a second line-up at about the same time. Officers Walker and Reed then took Cook to another room farther away, which Cook said frightened him because he feared another beating. Cook testified that Walker asked, " 'Well, Bennett, don't you know that you were identified on that line-up out there? . . . For robbing a liquor store,' " and Cook replied, "Well, I commited no such crime." Cook was then handed a statement purportedly written or made

by one of the other defendants, and directed to "Read this." Supposedly, the other defendant or defendants had referred to Cook in very uncomplimentary terms, according to the officers, and then Cook was asked, "You did know that robbery has been committed, didn't you?" and Cook replied, "No, I didn't." The officers, on the occasion of this interview, according to Cook, swore at him violently, questioned his parentage and legitimacy, and used vile and filthy language to and about him, and threateningly picked up an ash tray as though to hit him with it. Cook then stated that he had been beaten before, and "I didn't put it past him to do it again," and further, that he was in great fear. After Cook testified Officer Walker was then recalled to the witness stand and denied that he ever struck Cook or threatened or swore at him. Officer Reed then took the witness stand and testified that he did not strike Cook, nor threaten him nor swear at him.

Officer Walker was then recalled as a witness and asked to relate the conversation with Cook which took place on the 23rd of January. An objection was made by counsel for Cook, which was sustained by the court; the court stating that the statements of Cook on the 23rd were not made freely and voluntarily and that the court believed the defendant rather than the officers. The court then indicated that insofar as Officer Walker was concerned, he would make the same ruling as to the talk which took place on the 30th.

There was another interview or interrogation on the 30th of January, 1956, which the officers referred to as a "round table" conference. Such a gathering has been defined or described in one dictionary as a meeting of a group for discussion, deliberation and decision upon questions of mutual interest—a sort of debate—where no precedence in rank can be indicated, for the purposes of a free discussion. A transcript of what was testified to at that session would lead us to believe that perhaps "round table" conference was not quite an accurate description of what occurred. However, we will refer to it as the round table talk. At the round table session on the 30th, Officers Bentley and Woolley were in the room, as were the four defendants, and part of the time, Officers Walker and Reed were there.

Officer Woolley was called as a witness and stated that he was present at the round table discussion on the 30th, which lasted about 45 minutes; that the four officers worked as a four-man team, and the defendants were interrogated "by the

team." Upon a *voir dire* examination, he stated that he knew of the 48-hour limitation (Pen. Code, § 825), and that during all of the time from the arrest on the 21st, to the time of the filing of the complaint, nine days later, the defendants were interrogated by somebody of the four-man team. The officer was then asked to relate what was said at the round table talk. An objection was made and was overruled. The officer then related that he talked with the various defendants, other than Cook, and he set forth what had been said at various times and occasions, and that he said to Clemmons, at the very conclusion of the talk, "I then asked him, I told Cadillac (Clemmons), I says, 'Now, on the date,' 'On the 20th, that this liquor store was robbed,' I said, 'you told us that Benny Cook drove the car and furthermore that you had returned to the apartment from East L.A., from that job,' that Benny Cook had stated that—had made the first remark about robbing Doc's Liquor Store, to the effect that he needed some money, and he (Clemmons) stated, 'That is correct,' " That he, Woolley, "then turned to Benny Cook and told—I said, 'Benny, you have heard what these fellows have to say. What do you have to say to this?' " The officer testified that Cook remained silent.

At the conclusion of the taking of the evidence, counsel for Cook made a motion which, in substance, asked the court to advise the jury to find Cook not guilty. The district attorney, in answering that motion, made the following statement:

"MR. LEWIS: Well, there is an accusatory statement to Bennie Cook. All there is tying him in with it is an accusatory statement made to him by Officer Woolley, who testified, at the very end of the round-table conference, which accusatory statement was not denied, which has the effect of an admission."

It was pointed out to the court that there was no proper foundation laid for the statements to be used, that there was no showing of any opportunity upon the part of Cook to respond, nor was there any showing as to what the physical situation was, that is, whether Cook was able to or did hear the statement or statements. The court then indicated that he would not dismiss the case in the interests of justice, nor would he advise the jury to acquit Cook.

There appears to be little doubt as to what occurred at the meeting on the 23d. Even the district attorney, in his final argument, referred to the police action as follows:

"Now, they made an issue about the Officers here; they made issue about the Officers being brutal and the Officers kept them too long, . . .

"I am not in favor of Police brutality, believe me, I am not; I think it is wrong. I am not in favor of holding men in jail a long time before they are brought to trial, but there was an excuse for holding them a long time in this case because here the testimony was that more things were developing, they talked to one and the other, and things kept developing, and that would account for the reason they were kept there so long."

It is contended by Cook that the sole evidence connecting him with the crime is the accusatory statement of the 30th (as the district attorney argued to the court), and that such statement and the evidence of his silence in the face thereof should not have been admitted into evidence. We agree with the defendant Cook.

There are two matters, among others, involved in this proceeding—the one, a rule of evidence, the vicarious or implied admissions doctrine, and the other a rule of constitutional law, the privilege against self-incrimination under article I, section 13, of the California Constitution.

There is, of course, no contention by the attorney general that Cook ever designated anyone to speak for him, nor is there any contention that he had at any time affirmatively or otherwise adopted what had been said by any of his codefendants at the round table talk. The whole theory of the People seems to be based on the expression that "silence is consent." ("*Qui tacet consentire videtur.*" He who is silent is understood to consent.) It is an old expression, with perhaps some truth to it on occasions, but there must be and are times when silence is anything but consent. Some courts have said that such species of evidence is permitted because the party's silence is supposed to indicate acquiescence, and at the same time saying that nothing can be more dangerous than this kind of evidence and that it should be received with caution, and never ought to be unless the evidence is of direct declarations of that kind which naturally calls for contradiction. (*Moore* v. *Smith,* 14 S.&R. (Pa.) 388, 393 [1826].) We are fully aware of section 1870, subdivision 3, of the Code of Civil Procedure, which reads: "In conformity with the preceding provisions, evidence may be given upon a trial of the following facts:

. . . . . . . . . . . .

"3. An act or declaration of another, in the presence and within the observation of a party, and his conduct in relation thereto;" and the cases of *People* v. *McCrea,* 32 Cal. 98 in 1867; *People* v. *Marineau* (1942), 55 Cal.App.2d 893 [132 P.2d 22]; *People* v. *Spencer* (1947), 78 Cal.App.2d 652 [178 P.2d 520]; *People* v. *McKnight* (1948), 87 Cal.App.2d 89 [196 P.2d 104]; *People* v. *Trujillo* (1948), 32 Cal.2d 105 [194 P.2d 681]; *People* v. *Miner* (1950), 96 Cal.App.2d 43 [214 P.2d 557], and *People* v. *Baker* (1953), 119 Cal.App.2d 426 [259 P.2d 737].

In the case of *People* v. *Simmons* (1946), 28 Cal.2d 699 [172 P.2d 18] the matter of accusatory statements was involved, and the court, in determining the cause said (at pages 712-720):

". . . A third situation is presented when the accused stands mute in the face of the accusation or responds with an evasive or equivocal reply. In that situation this court has held that *under certain circumstances* both the statement and the fact of the accused's failure to deny are admissible on a criminal trial as evidence of the acquiescence of the accused in the truth of the statement or as indicative of a consciousness of guilt.

". . . Where his response is silence, evasion, or equivocation, it is for the trial court to determine in the first instance whether the accusation has been made under circumstances calling for a reply, whether the accused understood the statement, and whether his conduct or response was such as to give rise to an inference of acquiescence or guilty consciousness. Where the trial judge determines that such an inference may be drawn, the statement is then admitted, not as substantive evidence in proof of the fact asserted but merely as a basis for showing the reaction of the accused to it.

. . . . . . . . . . .

"It is also apparent that when a person is in the hands of his accusers he may well and soundly conclude that his best interests will be served by silence, evasiveness, or equivocation. For this reason, in a number of jurisdictions it has been held that the mere fact of arrest is sufficient to render inadmissible the fact of the accused's failure to deny accusatory statements when made in his presence and hearing. These courts maintain that it is the common knowledge and belief of men in general that silence while under arrest is most conducive to the welfare of an accused whether he be guilty or innocent; that the maintenance of silence is the

best strategic policy for one in the custody of the law, and that it is entirely consistent with innocence. (Citing authorities.) Other jurisdictions, including California, have adhered to the more flexible rule that the fact of arrest, alone, may not be sufficient to render the testimony inadmissible, but that such fact deserves consideration as one of the circumstances under which the accusation was made, in determining whether the accused was afforded an opportunity to deny and whether he was naturally called on to do so. (Citing authorities.)

. . . . . . . . . . . . . . .

"Early California cases foreshadowed adoption in this state of a limited rule of admissibility (*People* v. *Dole,* 122 Cal. 486 [55 P. 581, 68 Am.St.Rep. 50] . . .; *People* v. *Estrado,* 49 Cal. 171; *People* v. *Ah Yute,* 53 Cal. 613; *People* v. *McCrea,* 32 Cal. 98), and when the question was directly presented, such a rule was adopted and the Kenney case was distinguished (*People* v. *Amaya,* 134 Cal. 531, 536 [66 P. 794], et seq. . . .). This court said: 'It is no doubt true, that, to render evidence of this character admissible, *the occasion and the circumstances* must have been such as to afford the accused person an opportunity to act or speak, and the statement must have been one naturally calling for some action or reply. (Greenleaf on Evidence, par. 197.) But in this state it has been uniformly held that an accusation of crime does call for a reply, even from a person under arrest. (Citing cases)' (Emphasis added.) This rule has since been consistently followed (citing cases).

. . . . . . . . . . . . . .

"In this state, under a proper application of the rule, it has at times been held either by the trial court in the first instance, or by the courts on appeal, that the surrounding circumstances were not such as to render the evidence admissible. (Citing cases.) In many other cases, as above cited, even where the defendant was under arrest at the time of meeting the accusation, the evidence has been admitted.

"*There appears, however, of late to be a growing tendency on the part of trial courts to indulge too broad a discretion in allowing admission of such evidence in the first instance; a failure to fully consider the question of whether the accused replied under restraint; whether the circumstances under which the accusation was made called for a reply; whether the accused understood the statement; and whether his conduct merely indicated a desire to avail himself of the rule*

*against self-incrimination or whether it could reasonably give rise to an inference of acquiescence or guilty consciousness.* (Emphasis added.)

. . . . . . . . . . . . . .

"For this reason, any accusatory statement and a response thereto made by a defendant under restraint, should be considered with great caution, and if the police questioning has been insistent, so that the defendant has been induced or persuaded against his better or more considered judgment to make a response or has adopted the policy of silence, the accusatory statement should be held inadmissible by the trial judge in the first instance. The same ruling should be made if it appears that a great mass of extraneous hearsay matter will be placed before the jury through this device. Where a defendant is under mental police coercion the situation is no different than if a gun were held at his head to compel him to talk, and his response should certainly be held inadmissible unless, at the time of questioning, the defendant has been clearly advised that his reaction can be held against him as an admission. And certainly the fact that the accused is under arrest or any other form of restraint should be an important factor pointing to inadmissibility. *No violation of the privilege against self-incrimination can be sanctioned.* (Emphasis added.)

. . . . . . . . . . . . . .

"For the foregoing reasons it is apparent that the prevailing liberality in the admission of accusatory statements and the response of the defendant thereto, made at a time when he is under arrest or other restraint preventing freedom of reply or justifying silence or equivocation, must be greatly curtailed, and particularly so where an entire transcript is sought to be introduced in evidence by this device."

Time and time again, Cook denied any complicity with the robberies. The trial court found that he had been beaten, struck, sworn at and threatened by the police, and was threatened with more of the same course of conduct. After nine days of interrogation, seven days of which were after a complaint should have been filed if such was to be done, and after repeated denials Cook could have well asked himself, "What useful purpose is served by my affirmatively denying the charges?" Before the 30th "round table" meeting Cook had received a taste of being beaten, struck and shabbily treated, and he was, on the 30th, apparently not interested in playing any active part in the "round table discussion"

where it could have appeared to him that he was going to end up with a black eye and a bloody nose, and the police would have a "free and voluntary confession." Cook, in his dilemma, chose to remain silent. He was, without question, under stress, subordination and control, restrained by fear, by doubts, and by a reasonable belief that his immediate safety and comfort called for and would be promoted by absolute silence. It was reasonable for him to believe that to get implicated in a word battle with his accusers might well result in his great physical discomfiture, among other things.

Furthermore, there was no proper foundation laid by the district attorney. There was no showing as to whether there was a babel of tongues with everybody talking at once, excepting Cook, or whether it was a well organized round table discussion with an efficient chairman who only permitted one person to speak at a time, or whether Cook heard or should have heard what was said, or whether Cook paid any attention to anything that was said, or whether he understood the questions, or whether Cook directed his entire attention to the return of the officers who had theretofore beaten him. Cook, being an ex-convict, by the nature of things, knew something about investigations and he might well have followed the admonition that "there is a time of speaking and a time of being still" and that to take the risk of provoking a controversy by adding one more affirmative denial to his already many and repeated denials was a hazard he did not care to take.

In California it is recognized that the privilege against self-incrimination goes to and is with the citizen in the police station. (*People* v. *Loper,* 159 Cal. 6, 20 [112 P. 720, Ann. Cas. 1915B 1193] ; *People* v. *Simmons, supra,* 28 Cal.2d 699, 716; *People* v. *Talle,* 111 Cal.App.2d 650, 675-676 [245 P.2d 633] ; *People* v. *McCormick,* 102 Cal.App.2d Supp. 954, 957 [228 P.2d 349] ; *People* v. *Spencer,* 78 Cal.App.2d 652, 657 [178 P.2d 520] ; *People* v. *One 1941 Mercury Sedan,* 74 Cal. App.2d 199, 213 [168 P.2d 443].)

If the privilege does extend to the police station, as it apparently does, it is difficult to see how Cook, under the circumstances, waived any right to be silent by the simple process of remaining silent. If he did not waive the right, he was certainly clothed with it, and was entitled to all of its protection.

On the matter of the privilege against self-incrimination, Wigmore, in his work on Evidence (3rd ed., vol. VIII, p. 307)

sets forth that the questioning of one who has not as yet been charged was the very situation which gave rise to the privilege in the first instance, and, among other things, states (pp. 307-309) : ''In the hands of petty bureaucrats, whether under James the First, or under Philip the Second, or in the twentieth century under an American republic, such a system is always certain to be abused. . . .

''No doubt a guilty person may justly be called upon at any time, for guilt deserves no immunity. But *it is the innocent that need protection.* Under any system which permits John Doe to be forced to answer on the mere suspicion of an officer of the law, or on public rumor, or on secret betrayal, two abuses have always prevailed and inevitably will prevail; first, the petty judicial officer becomes a local tyrant and misuses his discretion for political or mercenary or malicious ends; secondly, a blackmail is practised by those unscrupulous members of the community who through threats of inspiring a prosecution are able to prey upon the fears of the weak or the timid.

. . . . . . . . . . . . . . .

''The real objection is that *any system of administration which permits the prosecution to trust habitually to compulsory self-disclosure as a source of proof must itself suffer morally thereby.* The inclination develops to rely mainly upon such evidence, and to be satisfied with an incomplete investigation of the other sources. The exercise of the power to extract answers begets a forgetfulness of the just limitations of that power. The simple and peaceful process of questioning breeds a readiness to resort to bullying and to physical force and torture. If there is a right to an answer, there soon seems to be a right to the expected answer,—that is, to a confession of guilt. Thus the legitimate use grows into the unjust abuse; ultimately, the innocent are jeopardized by the encroachments of a bad system. Such seems to have been the course of experience in those legal systems where the privilege was not recognized.''

We are not unmindful of the comments of Dean Wigmore in saying (pp. 317-318) : ''A stranger from another legal sphere might imagine, in the perusal of our precedents, that the guilty criminal was the fond object of the Court's doting tenderness, guiding him at every step in the path of unrectitude, and lifting up his feet lest he fall into the pits digged for him by justice and by his own offences. The judicial practice, now too common, of treating with warm and foster-

ing respect every appeal to this privilege, and of amiably feigning each guilty invocator to be an unsullied victim hounded by the persecutions of a tyrant, is a mark of traditional sentimentality. It involves a confusion between the abstract privilege—which is indeed a bulwark of justice—and the individual entitled to it—who may be a monster of crime. There is no reason why judges should lend themselves to confirming the insidious impression that crime in itself is worthy of protection. The privilege cannot be enforced without protecting crime; but that is a necessary evil inseparable from it, and not a reason for its existence. We should regret the evil, not magnify it by approval.

. . . . . . . . . . . . . .

"There ought to be an end of judicial cant towards crime. We have already too much of what a wit has called 'justice tampered with mercy.' A due respect for the privilege is perfectly consistent with a strict contempt for the guilty offender, and does not require or condone his protection as an end good in itself or good under any circumstances. It is enough for justice and for the commonwealth that the privilege exists, immovably fixed in the Constitution. The good which it aims at consists in that general fact and system, and not in the individual application of it to a given claimant. *That* effects mostly harm,—a particular harm which we suffer for the larger good."

 The attorney general has argued that there was no proper objection to the statement of the officer. In *People* v. *Rodriguez*, 58 Cal.App.2d 415, at page 421 [136 P.2d 626], it is said:

"Counsel for defendant did not object to the testimony of Officer Story as to the confession upon the ground that there was no showing that it was voluntary, but on the grounds that it was incompetent, irrelevant and immaterial and no foundation laid (for impeachment). The failure to make a timely and sufficient objection is of no moment where a grave matter of public policy is involved. Counsel for the defense do not bear the entire burden of protecting the constitutional rights of their client. Where those have been invaded, as they appear to have been here, and the opportunity arises on appeal to undo the wrong, the court cannot allow itself to be hampered by the failure of counsel to register an objection. Undoubtedly a defendant can waive a constitutional right, but where the alleged waiver is of the right to

exclude a confession obtained by illegal means, we are not willing to accept less than an express waiver, at least not one arising from mistake and inadvertence.''

This case forcefully brings to the forefront that one of the best possible ways to insure that a probably guilty man will go unpunished is to deprive him of the basic safeguards which our laws afford him.

It is true that sometimes there is a temptation to the most scrupulous law enforcement officers to bypass one or more of these safeguards when they just ''know'' a man is guilty, and we would be the last to deny that to operate under the law sometimes is harder than to operate outside it, but it has been demonstrated time and again that, in the long run, police operations within the framework of restrictions duly established can be just as effective and the results much more enduring.

The judgment as to Will Jones is affirmed.

The judgment as to Bennett Cook is reversed, and the cause remanded for a new trial.

White, P. J., and Doran, J., concurred.