338 P.2d 397]

[Crim. No. 6191. In Bank. Apr. 22, 1959.]

## THE PEOPLE, Respondent, v. MARION JAMES LINDEN, Appellant.

Frank Heller, under appointment by the Supreme Court, and Lester M. Fleischner for Appellant. Additional briefs, by permission of the court, were filed by the Appellant *pro se.*

Edmund G. Brown, Attorney General, William E. James and Herschel T. Elkins, Deputy Attorneys General, for Respondent.

SCHAUER, J.—This is an appeal (Pen. Code, § 1239, subd. (b)) from a judgment which, pursuant to jury verdict, imposes the death penalty for the first degree murder of Leo Wise, and from an order denying defendant's motion for new trial. Most of the problems here presented arise because defendant, from the inception of this lawsuit, has taken the position that the right to counsel includes the rights to be furnished a court-appointed attorney to act in such varying capacities as defendant may from time to time see fit to require—as attorney of record yet subject to defendant's direction, or as legal advisor, or as a mere clerk—and to be furnished a new court-appointed attorney when defendant becomes dissatisfied with counsel who have been assigned. We have concluded that defendant has been denied no essential aspect of any constitutional right, and that his claims of prejudicial error are without merit.

*The Substance of the People's Case.* On Saturday night, March 16, 1957, defendant became involved in a fight in a Los Angeles bar. Summoned by the bartender's shout, Police Officer Leo Wise, in uniform, entered the bar. He took defendant to the sidewalk, searched him for weapons and found none. The officer said, "I should arrest all of them, but I don't want to see you on the street any more. Go home."

Defendant walked away in one direction and Officer Wise in another. Later that night Officer Wise encountered defendant outside the bar and said, "I thought I told you to go home." The officer "patted him on the sides again" in a search for weapons, then went to a nearby police call box. As Wise started to place a call defendant, at about 12:20 a. m. on March 17, stepped to the officer's side, shot him twice at very close range, and ran away. Officer Wise fired twice at the fleeing defendant; defendant fired once more at the officer; and Wise placed a call and collapsed.

Defendant ran to his parked car and drove away. Luis Alatorre, an alert and courageous man who was driving by with three companions, saw the shooting and drove after the defendant. Motorcycle officers, encountered and alerted by Alatorre and his companions, pursued and halted defendant's car. One of the officers took defendant's gun from his belt. Alatorre and his companions shouted, "Be careful, he has a gun. He just shot a policeman." Defendant said to the officers, "you took me, but I got one . . . of the bunch. I would like to shoot some more, just like I did the last copper. I'll bet he is dead." (This statement and subsequent statements of defendant to police officers were interspersed with obscenities.) Defendant spat in the face of the officer who was handcuffing him. Other officers arrived and one of them said, "Let me have him for a while and I will fix him." The arresting officer replied that defendant "was under arrest and in my custody and to leave him alone." Defendant said to the latter officer, "Thank you, buddy, for stopping these [obscenities] from beating me up. I'll beat this in court. You are a good guy." Aside from the foregoing incident no officer threatened defendant. No force was used against him except to handcuff him and to hold him when he attempted to kick the officers. No hope of immunity or reward was extended, and in the officers' opinion defendant's statements were voluntary.

Lieutenant Gebhart and other officers in a police car took defendant to the Homicide Division. As they drove, defendant made the following statements: "I hope you have me for murder. I shot that . . . cop and I intended to kill him. If I had an opportunity I would kill all of you. . . . I tried to shoot him in the heart. . . . I shot him with a .32 and I didn't think it would do that much damage, but I hoped it would."

Defendant, Lieutenant Gebhart, and other officers were in

the Homicide Division from 12:45 a. m. until 3 a. m. on March 17. During this period defendant (who was handcuffed) kicked and spat at officers and knocked furniture about. Lieutenant Gebhart testified that during such period defendant made the following statements: In the anteroom of the Homicide Division, defendant said that three years before he had been "framed" by two policemen on a charge of "interfering with an officer"; "That these officers had perjured themselves in the court, that he was convicted . . ., and that at that time while he was doing his 90-day sentence, he made up his mind he was going to kill a police officer"; "that it took the jury eight hours of deliberation on a misdemeanor charge to convict him . . . and that he was very tough to beat, that he had beaten one other murder rap," and "he was going to be very hard to convict on this charge." Immediately thereafter in the office of the captain of the Homicide Division "the conversation . . . followed the same general outline with the exception that . . . Mr. Linden then said that he was not talking about himself; he was talking about a fictional character who had served 90 days on a bum rap, and then made up his mind to kill a police officer."

*The Tape Recordings of Defendant's Statements.* After the People had presented the foregoing evidence, defendant's trial counsel (a court-appointed private attorney who no longer represents defendant) and defendant personally requested and obtained the playing in evidence of a tape recording (introduced as People's Exhibit 19) of the interview in which defendant spoke of a "fictional character." This recording, in its intelligible portions, contains no direct admissions as to the shooting of Wise or defendant's intent to kill a police officer; it includes expressions of defendant's hatred of the police as a class and his arrogant belief that, as established by his criminal record, he was "tough to beat"; and it contains much vicious obscenity of defendant.

Defendant and his counsel had ample warning that the tape would contain language of defendant which might prejudice the jury.[1] Nevertheless defense counsel asked that all

[1] On voir dire examination the prosecutor asked a prospective juror if she would be prejudiced by evidence of defendant's vile language and said, "there may even be a tape recording of those statements in court." Thereafter the character of defendant's language was shown by the testimony of officers to his statements at the time of his apprehension and transportation to Homicide Division.

On direct examination of Lieutenant Gebhart, when defense counsel unsuccessfully objected to "piecemeal" testimony as to defendant's state-

recorded statements of defendant be produced and that it be "stipulated" that they would be played to the jury. The prosecuting attorney asked, "That is at the defendant's request?" Defense counsel said, "At the defendant's request. Isn't that true, Mr. Linden?" Defendant replied, "That is fine," and shortly thereafter interrupted the court to say, "Nothing cut out, sir, played in their entirety." Defendant asked and was allowed to speak privately with his counsel and immediately thereafter counsel repeated to the court that defendant wished "all" the tapes, "complete."

The prosecuting attorney produced all taped statements of defendant. Lieutenant Gebhart identified People's Exhibit 19 and it was played in evidence. The prosecutor said that he did not know the contents of the remaining tapes but that they were not of conversations to which the witnesses had testified and he did not feel that he could offer them in evidence. The court suggested that defendant and his counsel consult privately as to use of the additional tapes. Thereafter neither defense counsel nor defendant (who, as hereinafter related, subsequently undertook to represent himself) asked that the additional tapes be introduced in evidence.

Lieutenant Gebhart, further examined, reiterated his identification of People's Exhibit 19. When defense counsel concluded his cross-examination of the lieutenant, defendant himself interrupted the proceedings with a request to personally examine the witness and asserted, "That is not my voice on that recording; that is an actor. . . . I can prove it." There followed proceedings, hereinafter described, which led to defendant's assuming his own representation. Although

---

ments, the prosecuting attorney asked, "Would counsel like to hear the whole transcription?" and defense counsel replied, "That has been under discussion."

On cross-examination defense counsel brought out the fact that the lieutenant had seen a typed transcript of a recorded statement of defendant which indicated that much of the recording was unintelligible; counsel asked the witness whether his testimony as to defendant's declarations was based on isolated matters singled out from this transcript; before the witness could answer the prosecutor said, "it becomes apparent now that the entire tape recording should be made available, which I will present, and I would be most happy to have it presented to the jury"; the trial court said that this appeared unnecessary because it had not been shown (and it never was shown) that the lieutenant's testimony was based on the recording or transcript rather than his own recollection. Defense counsel then adduced from the lieutenant the testimony that *defendant, when his statements were being recorded, said "that they would probably have to delete certain portions of the tape . . . on account of his filthy language."* (Italics added.) It was after the foregoing developments that defense counsel and defendant asked that the tape be played in evidence.

defendant has since often repeated his assertion that People's Exhibit 19 is false, he has never offered any evidence in support of that claim.

The prosecuting attorney, shortly after the playing of People's Exhibit 19 and again in argument, emphasized that the tape had been put in evidence at defendant's request and that the People had not wished to place it before the jury. Defendant in argument asked the jury to listen to the tape again in order to determine whether it was of his voice. During the jury's deliberations the tape was replayed at their request.

■ *Defendant's Waiver of Counsel During Trial.* Counsel represented defendant without objection by the latter until the fifth day of trial. Defendant then twice interrupted the proceedings with requests to personally make motions and cross-examine. After he asserted, "That is not my voice on that recording," defendant refused to be silent and asked "to appear and defend himself in person." The court excused the jury. Defendant explained that counsel "did not want to go on with the case the way I wish" and did not believe that the tape was "framed." Defendant asked that his attorney be relieved[2] and that Mr. Frank Heller be assigned as counsel.

After considerable colloquy the court, with defendant's assent, reserved ruling on the questions of relieving defendant's counsel and his further representation until the People concluded their case. The jury were recalled. The People presented a little more evidence (including testimony of another officer who identified People's Exhibit 19) and rested.

Out of the presence of the jury the court fully and correctly advised defendant concerning the right to counsel, the lack of special privileges to a defendant who insists upon representing himself, and the absence of any right to advisory counsel in the capacity of "errand boy," all in substantial accord with the law as stated in *People* v. *Mattson* (1959), 51 Cal.2d 777, 793-795 [336 P.2d 937]. The court further, and properly (see *People* v. *Caritativo* (1956), 46 Cal.2d 68, 73 [10] [292 P.2d 513]; *People* v. *Dorman* (1946), 28 Cal.2d 846, 850 [1] [172 P.2d 686]), ruled that it would not appoint new counsel at the late stage of the proceeding. It relieved

[2]In making this request defendant incidentally stated of his counsel that he "has been very fair with me and he has been a very good attorney," to which the trial judge responded, "Yes, he has."

defendant's trial counsel as attorney of record and, with his consent and with express recognition of the difficult position in which he was placed, appointed him as legal advisor.

There was considerable discussion as to production of defense evidence, during which defendant took various inconsistent positions as to what he did and what he did not wish to produce. Among other things, he said that he wished "all records, medical records in the possession of the Los Angeles Police Department from 1952 through this date" and "all photographs from 1952 through the present date." From the colloquy it appears that a subpoena duces tecum for these records had been prepared but that their materiality was never sufficiently shown. The prosecutor produced certain photographs, they were "marked for identification," but defendant did not offer them in evidence. Concerning the "medical records" and additional photographs, the prosecutor thereafter asked, "Do I understand . . . [that the pictures already produced are] all the defendant desires at this time?"; defendant replied, "That is all at this time." Defendant also stated that he did not want the witnesses whom his counsel had subpoenaed and that "I am going to prove that recording is not one of my voice and I am going to try to prove it by this witness [defendant named the proposed witness and said that he was on trial in another courtroom in the building], maybe other witnesses that might come in voluntarily. I'm not going to subpoena witnesses, however." Defendant's advisor said that he would prepare and give to the sheriff a subpoena for the named witness. The court recessed "so any subpoena you want served may be prepared and served and you may try to locate this other witness."

When court reconvened, the judge asked, "Do you wish to call your witness now?" Defendant, without suggesting that he wished to offer any evidence, replied, "the defense rests."

Defendant's appeal counsel assert that the trial court did not determine that defendant understood the issues and available defenses and had capacity to effectively waive counsel, as required by *Johnson* v. *Zerbst* (1938), 304 U. S. 458, 464-465 [58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357]; *In re James* (1952), 38 Cal.2d 302, 313 [8] [240 P.2d 596]; and *People* v. *Chesser* (1947), 29 Cal.2d 815, 822-825 [4-6] [178 P.2d 761, 170 A.L.R. 246]. Further, they say, the following conduct of defendant shows that he was not competent to waive counsel: Prior to trial defendant told the court that

he was "not capable . . . on my own" of determining whether the evidence before the grand jury was sufficient. During the colloquy which resulted in defendant's being allowed to represent himself, his then counsel expressed willingness to remain as attorney of record "Without having anybody telling me how to try a lawsuit when they don't understand what is going on." From the circumstance that defendant did not produce evidence that the tape was false, appeal counsel infer that defendant did not understand that he could offer such evidence. They also say that "From the record, there is a question whether appellant was cognizant of the possible defenses available to him, e.g., self defense," and that "In addition, the confusion which arose with reference to the subpoenaing of the Police Department pictures and records . . . and of witnesses, was evidence that the appellant did not know what he was doing."

The foregoing argument is based upon isolated occurrences taken out of context and unwarranted inferences therefrom. Prior to trial defendant was repeatedly urged, and refused, to accept representation by the public defender; he presented the untenable but not naive argument (since rejected in *People* v. *Mattson* (1959), *supra*, 51 Cal.2d at p. 783 et seq.), that his state constitutional (art. I, § 13) and statutory (Pen. Code, § 686) right to "appear and defend, in person and with counsel" was "conjunctive" and entitled him to conduct his case personally and at the same time to be furnished the advice of an attorney; he evidenced alertness to protect his rights by his reiterated requests for an attorney to advise him whether the indictment was subject to demurrer or motion to set it aside; and it was in this latter connection that he said, indicating recognition of the difficulty which he might encounter if he insisted upon representing himself, that "I am not capable . . . on my own" of appraising the testimony before the grand jury. Long before trial defendant was afforded the advice and accepted the representation of his trial counsel, and after defendant was allowed to undertake his own representation he still had the advisory services of counsel. Trial counsel's statement, when the matter of relegating him to the position of advisor was under discussion, that he was willing to try the case without direction from anyone who did not "understand what is going on," did not indicate his opinion that defendant was altogether devoid of understanding; rather, it indicated no more than what defendant had already explained; i.e., that defendant and

counsel had reached an impasse because counsel did not believe and would not attempt to prove that the tape recording was falsified.

Defendant was afforded opportunity to obtain the evidence (if in truth it existed) which he indicated he desired. His advisor undertook to prepare and give to the sheriff a subpoena for the witness whom defendant asserted could testify concerning his claim that the tape was false. We can only conclude that defendant's failure to present any defense was not due to confusion or ignorance but rather to the nonexistence of admissible evidence or to counsel's having privately persuaded defendant to have some regard for the rules of admissibility and the dangers of false evidence.

Before the trial court allowed defendant to represent himself, it held lengthy discussions with him and had ample opportunity to observe his abilities and disabilities. ■ As in *People* v. *Mattson* (1959), *supra,* 51 Cal.2d at pp. 788-789 [1], 794 [18], the entire record establishes that defendant was fully aware of his situation when he insisted upon representing himself, and the court was not required to demand that defendant, as a prerequisite to appearing in person, demonstrate either the acumen or the learning of a skilled lawyer. No abuse of discretion is shown.

*Asserted Incompetence of Defense Counsel.* Defendant's appeal counsel contend that defendant's trial attorney was so incompetent that defendant was denied effective aid of counsel (Cal. Const., art. I, § 13) and due process (U.S. Const., Amend. XIV, § 1). And defendant *pro se*[3] charges not merely inadequate representation but collaboration against him between his trial counsel and the prosecution. The latter charge is so entirely devoid of support that it will be given no further mention.

■ As the principal instance of trial counsel's asserted incompetence, appeal counsel cite the fact that trial counsel requested that the tape, People's Exhibit 19, be put in evidence without having asked to hear it.[4] Although defendant

[3]With consent of defendant's appeal counsel and this court, defendant has presented briefs in propria persona.

[4]The record does not show whether defense counsel heard the tape before he requested its introduction in evidence. (It does at least seem to indicate that he did not attempt to see the transcript of the tape, for after he had adduced testimony that Lieutenant Gebhart had seen such a transcript and after the prosecutor had said that he had such a transcript, defense counsel mistakenly said, ''No transcript was made.'') We can hardly imagine for what purpose counsel would cause the tape to be played before the jury if he had heard it. The People suggest that

*pro se* asserts that his trial attorney convinced him that the recording should be put in evidence, from the record as a whole we conclude that the damaging maneuver must be attributed to defendant personally and that his trial counsel cannot be charged with incompetence because he did not control his client in this regard. As we have indicated, defendant's counsel was careful to obtain defendant's consent in open court to the "stipulation" that the recordings be presented. There being nothing in the record to the contrary, we must assume that counsel did this in fairness to all concerned rather than to protect himself from his own careless or intentional initiation of tactics which might harm defendant. Defendant himself then stated his demand that the recordings be played "in their entirety" and asked and obtained his counsel's repetition of that demand. It appears to us that such demand by defendant was a part of his attempt to discredit the prosecution's case through the claim that the police had used an actor to "fake in" a voice on one or more of the recordings and misrepresented the voice as that of defendant. It thus appears that defendant decided to take the calculated risk of having People's Exhibit 19 presented. While it is unfortunate that defense counsel (in his own words) "built a lawsuit up to that recording," the record fails to persuade us that he is chargeable with defendant's plight. To the contrary, it appears probable that it was defendant's insistence upon urging his claim that the recording was false and did not contain his voice, and counsel's refusal to advance such contention, which led to defendant's demand that counsel no longer represent him.

Defendant complains that the incompetence of his trial counsel appears from his failure to keep from the jury reference to defendant's prior criminal record. Defendant was charged with and admitted two prior convictions of felony. One of these convictions (voluntary manslaughter) was brought to the attention of the jury as hereinafter explained. Defendant asserts that his trial counsel permitted and encouraged procedure contrary to the provision of section 1025 of

---

he may have thought that doubt would be cast on the officers' testimony as to defendant's express admissions that he intended to kill by a showing that no such admissions were recorded. We also note that apparently defendant can be quite persuasive (both the prosecutor and the trial court mentioned favorably his presentation of his oral argument to the jury) and it is not inconceivable that he might have misled counsel into the belief that there was some seemingly plausible reason for presenting the tape.

the Penal Code that, where defendant admits a previous conviction, it must not be alluded to on the trial.

Defense counsel, on voir dire examination of prospective jurors, asked, "In the event that the evidence in this case should develop the fact that the defendant had been convicted of a felony before, would that . . . prejudice you . . . ?" This reference was proper. So far as appears, defense counsel and defendant recognized that the prosecution evidence might show (as it did) admissions of defendant concerning his criminal record as inseparable parts of his admissions concerning the present crime. Also they may have planned that defendant would take the stand, in which event his prior convictions of felony could be shown by the People on crossexamination (Code Civ. Proc., § 2051). As a matter of trial tactics, the damaging effect of the People's bringing out a defendant's prior record may well be lessened if the matter is frankly anticipated by the defendant.

Lieutenant Gebhart, without objection, gave the previously mentioned testimony that defendant soon after his arrest said that "it took the jury eight hours of deliberation on a misdemeanor charge to convict him . . ., that he was very tough to beat, that he had beaten one other murder rap." Statements of defendant on the tape recording show that the mentioned "murder rap" resulted in conviction of manslaughter. Defendant urges that the receipt of this evidence violated the holding of *People* v. *Green* (1950), 96 Cal.App.2d 283, 291-292 [4] [215 P.2d 127], that it is error to receive evidence of defendant's admissions of a criminal record made in the course of but severable from admissible declarations concerning the crime for which defendant was on trial. Here, however, defendant's admissions concerning his criminal record were provable as necessary, inseparable parts of relevant admissions as to his attitude toward police officers and toward accusations of crime. (See *People* v. *McMonigle* (1947), 29 Cal.2d 730, 742 [177 P.2d 745]; *People* v. *Peete* (1946), 28 Cal.2d 306, 314-315 [1] [169 P.2d 924].) And since evidence of defendant's boasts that "he had beaten one other murder rap" was properly received, it was permissible for the prosecuting attorney to make the argument, of which defendant complains, that defendant "has gotten away with murder once." It thus appears that defense counsel did not invite or permit error in connection with defendant's criminal record.

Defendant *pro se* argues unconvincingly that he was

prejudiced by developments, to which the asserted incompetence of his trial counsel contributed, concerning the role of Mr. Alatorre and his companions in the apprehension of defendant. On examination of prospective jurors counsel for defendant properly asked whether the jurors had seen newspaper or television accounts of the death of Officer Wise, and the prosecuting attorney thereafter made particular inquiry as to a television program which praised ''four Mexican nationals'' who ''captured'' defendant. Defendant makes the peculiar complaint that he was tried by a jury who had *not* seen that program. He further complains that his counsel should have cross-examined the arresting officer to show that his testimony before the grand jury might be understood to mean that defendant expressed thanks for protection from the Mexicans rather than (as shown by the officer's trial testimony) from other officers. So far as appears such cross-examination would only have emphasized defendant's vile language and would not have adduced anything helpful to defendant. Defendant also complains of statements of the prosecuting attorney in argument concerning the ''Mexican boys''; these statements were factually correct and could not have prejudiced defendant.

 Also without merit is defendant's *pro se* contention that his trial counsel's incompetence and error of the court deprived him of an impartial jury. On voir dire examination the court asked the first two prospective alternate jurors, among other things, whether they knew the victim Leo Wise. They answered ''No.'' Thereafter, when the defense had only one peremptory challenge available, Mrs. Tepper was called as a prospective alternate juror. On examination by the court she said that she had heard its previous questions and would give the same answers as the jurors previously examined. Questioned by defense counsel, she said that she had two nephews on the Los Angeles police force, that she had heard of the killing, that Wise had been her neighbor but she had not known him well, and that she believed that she could give an impartial verdict. Defense counsel exercised his last peremptory challenge to excuse a juror other than Mrs. Tepper and she was sworn as an alternate juror.

The fact that Mrs. Tepper gave what defendant calls ''not a true answer'' to the above described question of the trial court could well have been and no doubt was considered by court and counsel to show inattention, not deliberate concealment or self-contradiction as to her acquaintance with Wise.

Certainly it does not appear as a matter of law that defense counsel made an unwise use of his last peremptory challenge. And no ground of challenge for cause appears. ▇▇▇ Where a prospective juror gives conflicting answers to questions relevant to his impartiality, the trial court's determination as to his state of mind is binding upon an appellate court. (*People* v. *Daugherty* (1953), 40 Cal.2d 876, 890 [4] [256 P.2d 911]; *People* v. *Eudy* (1938), 12 Cal.2d 41, 45 [2] [82 P.2d 359].)

▇▇▇ Furthermore, Mrs. Tepper, an alternate juror, did not participate in the deliberations of the jury which rendered the verdict against defendant.

▇▇▇ In connection with the selection of the jury defendant *pro se* further complains that the trial court did not comply with section 1066 of the Penal Code, which provides, "Before a juror is called, the defendant must be informed by the court, or under its direction, that if he intends to challenge an individual juror he must do so when the juror appears, and before he is sworn." No prejudice in this regard appears, since defendant's counsel presumably was aware of section 1066. (*People* v. *Ellsworth* (1891), 92 Cal. 594, 596 [28 P. 604]; *People* v. *O'Brien* (1891), 88 Cal. 483, 489 [26 P. 362].)

▇▇▇ The record does not support the claim that trial counsel was incompetent in his cross-examination of the witnesses who described the shooting. Viewing the cold record from the vantage ground of deliberation rather than in the heat of trial, it can be inferred that counsel may have made an occasional small mistake in cross-examination, but no prejudice whatsoever is shown to have resulted.

▇▇▇ Defendant *pro se* complains of the use in evidence of a map of the scene of the shooting. The prosecuting attorney produced the map. He did not, but defense counsel did, ask witnesses to refer to and indicate positions on the map. By stipulation it was received in evidence. Defendant's claim that this use of the map indicates bad faith of the prosecution and incompetence of defense counsel approaches absurdity.

▇▇▇ Defendant complains that his counsel during the playing of the tape recording sat near the microphone and the jury, where defendant could not see or speak with him. The record does not show the positions of the persons in the courtroom (although defendant mistakenly says that his statements in oral argument to the jury establish such positions). In any event, once the proceedings had come to a point where the tape was played (a situation for which, as we have concluded, defendant himself must be considered responsible), it

does not appear that counsel could have done anything on defendant's behalf had he remained in a position where he could consult with defendant; rather, counsel without impropriety could decide to place himself where he could best hear the tape and appraise its authenticity (as to containing defendant's voice) and its effect upon the jury.

█ There is no merit in defendant's *pro se* complaints that his trial counsel did not obtain a witness for defendant and did not cause the playing of the other tape recordings which had been produced by the prosecuting attorney but not offered in evidence. When defendant chose to appear in propria persona it became his duty, if he wished to present evidence, to do so himself (*People* v. *Mattson* (1959), *supra,* 51 Cal.2d at p. 794 [17]) and he cannot complain of any shortcomings in his defense which resulted from his informed discharge of his attorney (*People* v. *Pearson* (1940), 41 Cal. App.2d 614, 620 [107 P.2d 463]). This consideration also disposes of defendant's contention that the trial court and the prosecuting attorney should have caused compliance with the "stipulation" that "all" recordings would be put in evidence.

Defendant in propria persona complains that after he asked to be allowed to represent himself his trial counsel volunteered the following statements to the court in the presence of the prosecuting attorney: "the witnesses have all been subpoenaed with the exception of one witness, Mr. Bierman, whom I have on tape" but "I would not call him" because his testimony "has been ruined by the recording" and because the witness was ill; defendant had told counsel "not to subpoena but to talk with" a Mr. Peters; Mr. Peters had said that he would come to the courtroom, that "he couldn't place the defendant, but if he saw him, he could probably specify what his testimony would be." When defendant protested that his counsel had disclosed confidential matters, the attorney said that "those matters are not any longer of confidence between the defendant and myself. They are matters involving other parties that know of them. . . . [T]o protect both the defendant and the witnesses, I feel it is compulsory on my part to make that known to the court, so that he [defendant] will not say he is taken unawares." █ Of course confidential matters (i.e., matters privileged by Code Civ. Proc., § 1881, subd. 2) which an attorney learns from his client and prospective witnesses do not become subject to disclosure by the attorney merely because they become known to "other parties"

or because the client discharges the attorney. (*Hardy* v. *Martin* (1907), 150 Cal. 341, 344 [89 P. 111] ; *People* v. *Singh* (1932), 123 Cal.App. 365, 369-371 [11 P.2d 73].) But since counsel here did not reveal anything prejudicial to defendant or relevant to the ensuing conduct and outcome of the case, we need not decide whether his limited disclosure was a breach of confidence.

*Asserted Errors as to Choice of Penalty.* This case was tried before the effective date of Penal Code, section 190.1, which provides for separate trial of guilt and of penalty. The prosecuting attorney repeatedly made statements such as the following: "if this defendant is found guilty of first degree murder and sentenced to life imprisonment he has the right at the conclusion of seven calendar years to be considered for parole." This is correct law (Pen. Code, § 3046) which is pertinent, as a matter of fact rather than a proposition of law, to selection of penalty. (*People* v. *Turville* (1959), 51 Cal. 2d at pp. 620, 634 [10], 636 [21] [335 P.2d 678] ; *People* v. *Riser* (1956), 47 Cal.2d 566, 582 [20] [305 P.2d 1] ; *People* v. *Friend* (1957), 47 Cal.2d 749, 754-755 [1] [306 P.2d 463].)

On examination of prospective jurors the prosecutor also once stated that a person sentenced to life imprisonment is eligible for parole "within" seven years and twice stated that such a person may be paroled "in" seven years. These three isolated erroneous declarations, obviously inadvertent in view of the numerous correct assertions of the prosecutor that such a person would be eligible for parole *after* seven years, could not have misled the jury.

Defendant mistakenly asserts that his status is that of an habitual criminal with two prior convictions of felony, so that he would not be eligible for parole until he had served nine years (Pen. Code, § 3047.5). Although the indictment charged and defendant admitted two prior felony convictions, neither of such convictions would support a determination of habitual criminality, for as to one it was not alleged that defendant had served any term of imprisonment (see Pen. Code, § 644; *People* v. *Dawson* (1930), 210 Cal. 366, 372 [6] [292 P. 267] ; *In re Tartar* (1934), 1 Cal.App.2d 400 [1] [36 P.2d 419]) and the other was of manslaughter, an offense which does not affect habitual criminal status because it is not enumerated in section 644 (*People* v. *Barclay* (1953), 40 Cal.2d 146, 159 [252 P.2d 321], footnote).

Defendant complains that the prosecutor, when he correctly stated that one sentenced to life imprisonment may

be released by pardon, should further have said that the governor cannot grant a pardon "where the convict has been twice convicted of a felony, unless upon the written recommendation of a majority of the judges of the supreme court" (Cal. Const., art. VII, § 1). Defendant could not reasonably have been prejudiced in this regard. The significant matter was that if the jury fixed the penalty of life imprisonment there were nevertheless means by which defendant could be released from prison; the precise operation of those means was of no particular importance. (See *People* v. *Reese* (1956), 47 Cal.2d 112, 119 [301 P.2d 582].)

█ On one occasion, immediately after declaring that one sentenced to life imprisonment is eligible for parole after seven years, the prosecuting attorney said, "I'm not trying to invade the discretion of the jury . . . but you should consider . . . all the facts in your determination, not only as to whether the man is guilty or not, but what penalty he should receive." We cannot agree with defendant that the foregoing statement may have caused the jury to weigh the possibility of parole in considering the question of guilt. In this connection, on several other occasions, the prosecutor made it clear that the matter of parole would be relevant only if the jury found the defendant guilty of first degree murder.

█ The prosecuting attorney in argument said that the jury would be instructed that if they found defendant guilty of first degree murder they "are given the unlimited right" of choice between the penalties of life imprisonment and death,[5] and that "You may say to yourself, what kind of first degree murder warrants life imprisonment and what kind . . . warrants the death penalty?" The prosecutor said that

---

[5]The court correctly instructed the jury on this subject as follows:

"It is the law of this State that every person guilty of murder in the first degree shall suffer death or confinement in the state prison for life at the discretion of the jury. If you should find the defendant guilty of murder in the first degree, it will be your duty to determine which of the two penalties shall be inflicted, the death penalty or confinement in the state prison for life. If you should fix the penalty as confinement for life, you will so indicate in your verdict. If you should fix the penalty as death, you will so indicate in your verdict. In determining which penalty shall be inflicted, you are free to act according to your own judgment and discretion.

"Beyond prescribing the two alternative penalties, the law itself provides no standard for the guidance of the jury in the selection of the penalty but rather commits the whole matter of determining which of the two penalties shall be fixed to the judgment, conscience and discretion of the jury and, in the determination of that matter, the jury must agree unanimously as to which of the two penalties shall be imposed."

this case "could very well be considered by you as a case which warrants the death penalty" and, "just by way of illustration," stated the facts of other cases "where the penalty might well be considered life imprisonment." He then said, "what is there in this case when you apply the instructions and your own unlimited discretion to say you shouldn't impose the death penalty? I ask you to consider that as I review the testimony."

Defendant urges that the effect of the foregoing argument was to inform the jury, contrary to *People* v. *Friend* (1957), *supra*, 47 Cal.2d 749, 755 [2], and *People* v. *Green* (1956), 47 Cal.2d 209, 218 [302 P.2d 307], that they should impose the death penalty unless they found extenuating circumstances. We do not believe that the argument, considered as a whole, has that effect; it presents the prosecutor's opinion that the facts of this case warrant the death penalty, not a contention that the law requires the death penalty in the absence of mitigating circumstances.

Error appears in the following portion of the prosecuting attorney's argument: "in California we have a law that where a death penalty is imposed . . ., it goes immediately to the Supreme Court of the State of California. They review your decision if a death penalty is imposed, and they determine from the law whether such a penalty is justified, or if they believe the evidence is such that only a second-degree murder was committed, or they could determine that there was prejudicial error." This argument contains incorrect suggestions contrary to the following holdings:

No matter how convincing the evidence of second degree murder may appear to an appellate court, such court cannot "believe the evidence is such that only a second-degree murder was committed" if there is evidence of and the trier of fact finds first degree murder. (*People* v. *Matlock* (1959), 51 Cal.2d at pp. 682, 698 [24] [336 P.2d 505].) The trier of fact has sole responsibility and absolute discretion to select the penalty for first degree murder. (*People* v. *Friend* (1957), *supra*, 47 Cal.2d 749, 759 [5a], 764 [11]; *People* v. *Green* (1956), *supra*, 47 Cal.2d 209, 218 [7].) This court cannot substitute its judgment as to choice of punishment (*People* v. *Odle* (1951), 37 Cal.2d 52, 58 [3, 4] [230 P.2d 345]) even where we may doubt the appropriateness of the death penalty (see *People* v. *Brust* (1957), 47 Cal.2d 776, 792 [306 P.2d 480]; *People* v. *Danielly* (1949), 33 Cal.2d 362, 383 [202 P.2d 18]). Where there is error related only to

selection of the death penalty this court cannot correct the error by reducing the punishment, but must reverse and remand the question to the trier of fact. (*People* v. *Green* (1956), *supra*, 47 Cal.2d 209, 235 [15].) It is only the trial court which is empowered to reduce the degree or class of offense based on its view of the weight of the evidence. (*People* v. *Borchers* (1958), 50 Cal.2d 321, 330 [325 P.2d 97].)

A jury should approach the tasks of finding facts and exercising discretion as to choice of penalty with appreciation that their duties are serious and that they are accountable for their decisions, not with the feeling that they are making mere tentative determinations which the courts can correct. The jury have no concern with and should not be informed of the automatic appeal where judgment of death is imposed, and of course they should not be misinformed (as they inferentially were here) concerning this court's powers.

Argument such as that of the deputy district attorney above quoted improperly diminishes the jury's recognition of their duties and responsibilities and powers. In *People* v. *Sampsell* (1950), 34 Cal.2d 757, 762 [2], 765 [214 P.2d 813], we characterized similar but more censurable argument as "reprehensible conduct which is not to be condoned," and stated that "we can see no justification for such an argument in the light of the settled rule respecting the function of this court." However, we held that the error, in the circumstances of that case, was not reversible. Since our clear pronouncement in Sampsell there is even less justification for argument of this sort.

It seems that prosecuting officials sometimes consider a holding that particular misconduct is error but not, in the circumstances, prejudicial, as establishing that as a matter of law the conduct is cause for mere rebuke but not reversal (see *People* v. *Wilkes* (1955), 44 Cal.2d 679, 687 [8] [284 P.2d 481]), and continue to try their cases improperly in the expectation that, should a conviction be obtained, the appellate court will uphold it under section 4½ of article VI of the California Constitution (see *People* v. *Lyons* (1956), 47 Cal.2d 311, 319 [8] [303 P.2d 329]). Conduct of that kind demeans the office of prosecutor and his profession. Because it relates to the jury's selection of penalty it implicitly invites reversal in every case. Only under extraordinary circumstances can the constitutional provision save the verdict.

Here, the following circumstances combine to avoid an otherwise indicated reversal and remand for a new trial on

the issue of penalty. Uncontroverted evidence clearly establishes defendant's guilt; at the trial defendant did not object to the prosecutor's remarks; defendant in argument to the jury admitted that he killed Officer Wise[6] and said that he desired the death penalty with the consequent right of automatic appeal.[7] In the circumstances he cannot successfully object that he received what he requested.

We reject defendant's complaint as to the absence of more specific instructions as to penalty. Having assumed the burdens of counsel, he did not request such instructions, and the situation did not require the trial court to formulate and give them of its own motion.

*Other Claimed Errors at the Trial.* Defendant *pro se* complains that the trial court did not comply with the requirement of Penal Code, section 1122, that it admonish the jury, at each adjournment, "that it is their duty not to converse among themselves or with anyone else on any subject connected with the trial, or to form or express any opinion thereon until the cause is finally submitted to them." No prejudicial impropriety in this regard appears. At each ordinarily taken recess the jury were admonished in the statutory language or an abbreviation thereof. The only occasion when the jury were taken from the courtroom without any admonition was when defendant, while represented by counsel, interrupted the proceeding with reiterated requests to conduct the case personally; the trial court then said, "Put the defendant in the lockup. Ladies and gentlemen of the jury, go upstairs. We have a legal point that will be argued outside the presence .of the jury." Failure to give the statutory admonition is not ground for reversal where, as here, no prejudice appears. (See *People* v. *Williams* (1954), 128 Cal.App.2d 458, 464 [12] [275 P.2d 513]; *People* v. *Pearson* (1940), *supra*, 41 Cal.App. 2d 614, 620 [6]; *People* v. *Jordan* (1937), 24 Cal.App.2d 39,

---

[6]Defendant said, "I am responsible for his death. . . . It is something I will be guilty of the rest of my life. It is also something I have to answer to later."

[7]Defendant argued, "I would rather have you bring back a first degree with a gas chamber because I would have a chance before a Court of Appeal to prove that tape is a fraud . . . [L]ife imprisonment . . . would never give me a right to prove . . . that tape was a fraud. . . . I do want you to take into your deepest consciousness that if you find me guilty of first degree murder, with the death penalty, you have no responsibility. You have no responsibility to this transcript [tape recording]. You have accepted it. . . . [M]y job then is to disprove it, and I will have the methods, I will have the chance . . . I will be trying to prove that Jimmy Linden . . . committed an illegal act, but he was not the person in that transcript [tape recording]."

56 [17] [74 P.2d 519] ; *People* v. *Leavitt* (1929), 100 Cal.App.
93, 94 [279 P. 1056].) After the jury have been re-
peatedly admonished in the full substance of Penal Code,
section 1122, it is not prejudicial error to give the admonition
in abbreviated form such as ''Remember and abide by the
admonition heretofore given,'' rather than repeating in full
the words of the statute. (See *People* v. *Burwell* (1955), 44
Cal.2d 16, 33 [279 P.2d 744].) This is particularly true where
no objection is made at the time the abbreviated instruction
is given. And the doctrine of invited error applies to
the occasion when defendant while represented by counsel per-
sonally interrupted the trial. (See *People* v. *Gomez* (1953),
41 Cal.2d 150, 162 [11] [258 P.2d 825].)

Defendant *pro se* complains that the trial court permitted
the prosecutor to ''instruct the jury.'' In argument the prose-
cuting attorney, without objection, attempted to explain and
illustrate the difference between a confession and an admis-
sion and said that a confession must be shown to have been
voluntary but that a coerced admission can be received in
evidence. Thereafter, a juror indicated that she had not under-
stood the prosecutor's explanation. Over defendant's objec-
tion that ''the prosecutor is instructing the jury,'' the trial
court allowed the prosecuting attorney to discuss the matter
further.

 A trial court in its discretion may permit counsel
to state correct law and illustrate its application to the facts.
(*People* v. *Chessman* (1951), 38 Cal.2d 166, 188 [29] [238 P.2d
1001].) Here we need not pass upon the correctness of the
law stated by the prosecuting attorney.[8] His argument could
not have prejudiced defendant because there is no evidence
that any declaration of defendant, whether admission or con-
fession, was coerced.

 Defendant *pro se* says that the prosecutor falsely
argued that the tape recording includes admissions of defend-
ant's expressed intent to kill an officer. Rather, fairly inter-
preted in context, the attacked portions of the argument prop-
erly urge that the recorded admissions of hatred toward police

[8]The cases as to whether a coerced admission can be received in evidence
are not uniform. (See *Rogers* v. *Superior Court* (1955), 46 Cal.2d 3,
10-11 [10, 13, 14] [291 P.2d 929]; *People* v. *Eggers* (1947), 30 Cal.2d
676, 689 [19] [185 P.2d 1]; *People* v. *Nagle* (1944), 25 Cal.2d 216 [3]
[153 P.2d 344]; *People* v. *Williams* (1901) 133 Cal. 165, 167 [65 P.
323]; *People* v. *Clemmons* (1957), 153 Cal.App.2d 64, 71, 76 [314 P.2d
142]; *People* v. *Allen* (1956), 142 Cal.App.2d 267, 268-269 [16a, 17]
[298 P.2d 714]; 19 Cal.Jur.2d, Evidence (1954), § 398.)

officers tend to prove the intent to kill which was more particularly evidenced by defendant's unrecorded direct admissions of such intent, and that the testimony as to the unrecorded admissions is strengthened by the recorded declarations because the same pattern of obscene language appears in both.

Defendant's *pro se* arguments concerning the effect of asserted inconsistencies in the evidence are not properly addressed to this court, for there is nothing in the record to suggest that any evidence is inherently improbable or intentionally false. (*People* v. *De Paula* (1954), 43 Cal.2d 643, 649 [8, 9] [276 P.2d 600].) Rather, the evidence is remarkably free from any significant conflict.

*The Propriety of the Proceeding which Resulted in Disallowance of Defendant's Proposed Corrections to the Reporter's Transcript.* Defendant *pro se* urges that the proceeding to settle the record violated the provisions of section 13 of article I of the California Constitution that "In criminal prosecutions, in any court whatever, the party accused shall have the right . . . to have the process of the court to compel the attendance of witnesses in his behalf, and to appear and defend, in person and with counsel." Furthermore, since proceedings to settle a seriously disputed record on a California appeal from a judgment of death have been characterized as "a necessary and integral part of the compulsory appeal" (*Chessman* v. *Teets* (1957), 354 U.S. 156, 162-163 [77 S.Ct. 1127, 1 L.Ed.2d 1253]), defendant's suggestion that questions of Fourteenth Amendment due process are involved must be considered.

After rendition of the judgment of death defendant, as required by law (Pen. Code, §§ 1217, 3600), was taken to San Quentin Prison. The superior court clerk delivered copies of the transcript to defendant (Rules on Appeal, rule 35 (b)) by mailing them to him at the prison. Defendant at this time was representing himself.[9] He filed "proposed corrections" to the reporter's transcript. These "proposed corrections" did not clearly indicate the nature of the asserted errors in the transcript. The trial court set October 30 for hearing and ordered that defendant be brought to Los Angeles. On October 28 there was filed in the superior court

---

[9]The occasion for this court to follow our long established practice of appointing counsel for an indigent unrepresented defendant on an automatic appeal had not yet arisen, because in ordinary course we have no way of knowing of the pendency of such an appeal until the transcripts have been certified and transmitted to our clerk. (Rule 35(e).)

defendant's request for appointment of counsel "to help and represent" him in the settlement of the transcript and for a continuance of the October 30 hearing to enable him to obtain witnesses and prepare. This request, in the circumstances of defendant's confinement, was timely. On the afternoon of October 29 the trial court appointed Mr. R. F. Bird, deputy public defender, to represent defendant. Defendant arrived in Los Angeles late on the night of October 29 and had opportunity to consult with Mr. Bird only briefly (defendant told the trial court that he "only had five minutes") on the morning of the 30th before the hearing.

When defendant and Mr. Bird appeared for the hearing (before the judge who tried the case), Mr. Bird said that "I am satisfied with that state of the record" but that defendant wished a continuance to obtain witnesses; "I did not ascertain from him who the witnesses are; our conversation . . . wasn't altogether cordial because when I told him that the chances are pretty great that his request for witnesses would be denied, he seemed to think that he could do more good representing himself that he could by being represented with counsel, at least by the Public Defender." Defendant said, "I would need advice on procedural matters, but the actual part of this hearing I wish to carry on myself" because "I am the only person who is acquainted with the facts." Defendant refused to be represented by Mr. Bird; the public defender was relieved; and defendant's repeated requests for advisory counsel and a continuance were denied.[10]

---

[10]The transcript shows the following statements by Deputy Public Defender Bird, the defendant, and the court, as indicated:

"MR. BIRD: County Counsel has ruled that the Public Defender cannot be appointed to just stand by and leave some man to represent himself. We have found by bitter experience that defendants under those circumstances do things that shouldn't be done, and it reflects on the Public Defender's office.

"We feel that if we are going to have any responsibility in the case we should have full responsibility and be in control so that nothing will be done in our name which we wouldn't do, which might reflect upon our reputation if it was done.

"MR. LINDEN: I realize that he has that very right, sir.

"MR. BIRD: Consequently, if the Court is going to appoint counsel to act as a sort of stand-by and give advice it should be someone other than the Public Defender.

"THE COURT: Take one step at a time, Mr. Linden. Do I understand that you do not desire to have the Public Defender?

"MR. LINDEN: I would be very satisfied with him.

"THE COURT: To represent you at this hearing?

"MR. LINDEN: Not to represent me, now, because the word 'represent' there—your Honor, I wish in conjunction given under Article I, Section

The burden was on defendant to show that the transcript was incorrect but he contended that because he had not had opportunity to prepare he could not assume this burden. The People introduced evidence (detailed testimony, on direct and cross-examination, of the reporter who took the notes which are transcribed in the disputed portion of the record) that the transcript is correct. The precise nature of defendant's objections to the transcript, as developed by himself during the settlement proceedings, became clear.[11] Defendant affirmatively showed that the making of, or the failure to make, his proposed corrections could not, either on defendant's suggested theories or any other conceivable theory, have the slightest effect on appellate review of the judgment of conviction. The claimed errors were not prejudicial or material to any issue on appeal.

The trial court stated that it did not determine the ma-

---

13 of the State Constitution, where it says I have a right to appear and defend in person and with counsel. In other words, I wish my statutory provision upheld. That's all I wish.

"MR. BIRD: I might make the statement for the benefit of the defendant that any attorney that is worth his salt isn't going to take a case unless he can control that case.

"MR. LINDEN: I realize that. I had one like that. . . .

"THE COURT: Let's settle the question if you desire to have Mr. Bird represent you as the lawyer. . . .

"MR. LINDEN: I do not wish him to represent me.

"THE COURT: Mr. Bird, you are relieved."

[11]The disputed portion of the transcript of the trial shows that at 11 a.m. the prosecutor resumed his opening argument; when he concluded it defendant's advisor said, "One of the jurors wants to speak"; the juror stated that the prosecutor "said something yesterday I didn't understand that I worried about all night"; the juror referred to the prosecutor's previously mentioned argument as to the difference between an admission and a confession; over defendant's objection that "the prosecutor is instructing the jury" and "I want a running objection to this line," the prosecutor was allowed to again discuss this difference; noon recess was then taken.

Defendant's position as developed by him at the settlement proceeding was that the above summarized portion of the transcript is incorrect in the following respects: Defendant's advisor did not say, "One of the jurors wants to speak," and the juror herself said that she "cried" rather than "worried" all night. (No possible relevance of these asserted inaccuracies to any contention which has been, or could be, made on appeal is shown.) Defendant further claimed that the discussion concerning the juror's question occurred beginning at 11 a.m., before the prosecutor's presentation of the last of his opening argument, rather than after he concluded such argument, and that if the transcript so showed then defendant's "running objection to this line [of discussion by the prosecutor of the difference between a confession and an admission]" would have been an objection not only to "this line" but also to everything that occurred from 11 a.m. until the noon recess. (Since defendant's "running objection" was specifically directed to "this line" it could only go to such "line," no matter when it was made.)

teriality of the proposed corrections but only that on the basis of the reporter's testimony it was satisfied that the transcript was in fact accurate. The court denied defendant's request that the trial jurors be subpoenaed to testify to their recollection of the proceedings, and disallowed the proposed corrections.

The right to counsel includes "reasonable opportunity to prepare for trial" (*In re Ochse* (1951), 38 Cal.2d 230, 231 [1] [238 P.2d 561]), and the refusal to allow a party to introduce any evidence may amount to denial of a hearing (*Estate of Buchman* (1954), 123 Cal.App.2d 546, 560-561 [267 P.2d 73, 47 A.L.R.2d 291]; *National Auto. Ins. Co.* v. *Fraties* (1941), 46 Cal.App.2d 431 [115 P.2d 997]).

Denial of fundamental constitutional rights is not excused by want of prejudice. (*People* v. *Sarrazawski* (1945), 27 Cal.2d 7, 11 [161 P.2d 934]; *People* v. *Broad* (1932), 216 Cal. 1, 8-9 [6] [12 P.2d 941].)

But questions of prejudice can be considered in determining whether there was in fact a denial of a fundamental constitutional right. [46] For example, concerning Fourteenth Amendment due process at the trial it is generally true that "A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense— a right to his day in court—are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel." (*In re Oliver* (1948), 333 U.S. 257 [68 S.Ct. 499, 507, 92 L.Ed. 682].) But specifically a state's failure to appoint counsel in a noncapital case violates the Fourteenth Amendment only when "the disadvantage from absence of counsel [is] aggravated by circumstances showing that it resulted in the prisoner [sic] actually being taken advantage of, or prejudiced" (*Townsend* v. *Burke* (1948), 334 U.S. 736, 739 [68 S.Ct. 1252, 92 L.Ed. 1690]); the presence of defendant at trial "is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only" (*Snyder* v. *Massachusetts* (1934), 291 U.S. 97, 107-108 [54 S.Ct. 330, 78 L.Ed. 674, 90 A.L.R. 575]); and the accused has no absolute Fourteenth Amendment right to confront and cross-examine the witnesses against him (*Stein* v. *New York* (1953), 346 U.S. 156, 195-196 [73 S.Ct. 1077, 97 L.Ed. 1522]).

Furthermore, neither California law nor our understanding of federal due process contemplates that the elements of a fair hearing on objections to a transcript are precisely the same as those of a trial. We conclude that where, as here, defendant personally appears at the transcript hearing and affirmatively shows that his proposed corrections are immaterial to disposition of the appeal, the refusal to allow him opportunity to prepare and present evidence as to those inconsequential corrections, if error at all, is no more than error of procedure which does not result in a miscarriage of justice and therefore does not require reversal. (Cal. Const., art. VI, § 4½.)

*Proceedings on Appeal.* This court appointed Mr. Frank Heller, the attorney whom defendant sought to have substituted as trial counsel, to represent him on appeal. Mr. Lester M. Fleischner is associated with Mr. Heller. After the appeal had been briefed by counsel and, with permission, by defendant in propria persona, defendant *pro se* filed an application to remove his attorneys and to appear personally and with some other court-appointed attorney, together with a "demand" that counsel withdraw and that pending withdrawal they obtain augmentation of the record. The "demand" includes baseless charges that defendant's appeal counsel were "planted" by the district attorney and "double-crossed" defendant.

We informed defendant that we would not permit him to appear personally for oral argument; that Mr. Heller would argue unless defendant advised us that he did not wish Mr. Heller to do so; that we would not appoint another attorney but would allow defendant to employ one and, if he did so, Mr. Heller would step out of the case; and that defendant or any attorney employed by him could file supplemental briefs or statements.

Thereafter defendant *pro se* filed an application for augmentation of the record, a supplemental brief, and an application for removal of his attorneys. The latter application states that "it would be misrepresentation if they [defendant's appeal counsel] are allowed to make oral argument." Since defendant had not employed other counsel, we denied the application for removal of his appointed counsel. Mr. Fleischner argued and counsel filed a supplemental memorandum on defendant's behalf. We commend counsel for their faithful and diligent representation of defendant in the face of his unwarranted attacks.

██ Defendant's *pro se* requests for augmentation of the record have been disposed of as follows: (1) He asked that the reporter's transcript be augmented to include oral proceedings of July 25, 1957, when he moved for a new trial. (The clerk's transcript shows that on that date the motion was merely made, not argued or determined. The subsequent hearing on the motion is fully transcribed.) Defendant asserts that on July 25 he stated that his motion was "on constitutional grounds" and that the omission of this statement from the record will indicate to a federal court that he did not properly raise his constitutional contentions in the trial court. We deemed augmentation in this regard unnecessary. Our review of defendant's constitutional contentions has not been affected by the absence of a statement that they were asserted as grounds for new trial. And since our opinion shows that we consider the constitutional questions to have been raised, defendant's record is protected should he wish to present the questions to a federal court. (See *Whitfield* v. *Ohio* (1936), 297 U.S. 431, 436 [56 S.Ct. 532, 80 L.Ed. 778].) (2) The request for augmentation of the record by a transcript of People's Exhibit 19 was granted. ██ (3) Defendant's request that the record be augmented to include tape recordings which were not offered in evidence could not be granted, for those tapes are not a part of the record in the trial court. (*Howard* v. *Howard* (1953), 119 Cal.App.2d 122, 123 [1] [259 P.2d 41].)

Neither prejudicial error nor miscarriage of justice is shown.

For the reasons above stated the judgment and order appealed from are affirmed.

Gibson, C. J., Shenk, J., Traynor, J., Spence, J., and McComb, J., concurred.

Appellant's petition for a rehearing was denied May 20, 1959.